**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ANDREW BOODOO,                    )
                                  )
                    Plaintiff,    )
                                  )
          v.                      )          Civil Action No. 24-1056
                                  )          Judge Nora Barry Fischer
AMP HOME CARE LLC,                )
*doing business as AMP*,          )
                                  )
                    Defendant.    )

**<u>MEMORANDUM OPINION</u>**

**I. INTRODUCTION**

This civil action arises from Plaintiff Andrew Boodoo's ("Plaintiff" or "Boodoo") employment and subsequent termination from Defendant AMP Home Care LLC, doing business as AMP ("Defendant" or "AMP"). Plaintiff alleges religious discrimination, failure to accommodate and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I); sexual harassment and retaliation in violation of Title VII (Count II); and religious discrimination, failure to accommodate, sexual harassment and retaliation in violation of the Pennsylvania Human Relations Act ("PHRA") (Count IV).[1] (Amended Complaint, ECF No. 26).

Presently before the Court is AMP's Motion for Summary Judgment (ECF No. 36) and accompanying appendix (ECF No. 36-3), its Brief in Support (ECF No. 39), and Concise Statement of Material Facts (ECF No. 38). Plaintiff filed a Responsive Brief (ECF No. 37) and accompanying appendix (ECF No. 37-2), a Response to Defendant's Concise Statement of

---

[1] In Count III of the Amended Complaint, Plaintiff alleges retaliation and intimidation in violation of the Adult Protective Services Act ("APSA"), 35 P.S. §§ 10210.101, *et seq.*, but now withdraws that claim. (Plaintiff's Counterstatement of Material Facts, ECF No. 40 at 19 n.12).

Material Facts, along with a Counterstatement of Facts (ECF No. 40). Defendant did not file a Reply, nor a Response to Plaintiff's Counterstatement of Material Facts. Pursuant to Local Civil Rule 56E for the Western District of Pennsylvania, Plaintiff's Counterstatement of Facts will be deemed admitted.[2]

Having considered the parties' positions and evidence in accordance with the standard governing motions for summary judgment, for the following reasons, the Court will deny Defendant's Motion for Summary Judgment and dismiss Count III of the Amended Complaint.

## II. BACKGROUND

The following facts are taken from the parties' Concise Statements of Material Facts and Responses thereto (ECF Nos. 38 & 40) and other evidence of record. Viewed in the light most favorable to Plaintiff, they are as follows.

AMP is a licensed provider of residential and supportive services for individuals with intellectual disabilities, operating under the oversight of the Commonwealth of Pennsylvania. (ECF Nos. 38, 40 ¶ 1). As a licensed provider under the Pennsylvania Office of Developmental Programs, AMP is bound by the regulatory mandates of 55 Pennsylvania Code Chapters 6100 and

---

[2] Local Civil Rule 56 E provides:

> **Admission of Material Facts.** Alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

LCvR 56 E. *See White v. Community Care, Inc.*, Civil Action No. 07-150-7, 2008 WL 5216569, at *1 (W.D. Pa. Dec. 11, 2008) (noting violation of Local Rule 56 and that plaintiff's additional facts alleged in plaintiff's Concise Statement of Material Facts deemed admitted where defendant failed to respond to plaintiff's additional facts.); *see also Lee v. Sixth Mount Zion Baptist Church of Pittsburg*, Civil Action No. 15-1599, 2017 WL 3608140, at *2 (W.D. Pa. Aug. 22, 2017) (citing *714 Ventures, Inc. v. Nat'l Oilwell Varco, L.P.*, No. CV 15-925, 2016 WL 59199934, at *1 n.1 (W.D. Pa. Oct. 11, 2016) (deeming facts admitted for violation of Local Rule 56.E)). As such, Paragraphs 1 through 133 of Plaintiff's Counterstatement of Material Facts (ECF No. 40 at pp. 19-37) are deemed admitted for purposes of deciding Defendant's Motion for Summary Judgment.

6400. These regulations prohibit neglect or abandonment of clients and require protection of individual rights.[3]  (*Id.* ¶ 2 & n.1).

Krystie Stiles is the COO/Executive Director for AMP Home Care. She oversees operations and ensures compliance with applicable regulations and internal policies.  (*Id.* ¶ 3). AMP employs Team Leads and Direct Support Professionals ("DSPs") to provide direct care and supportive services to individuals.  (*Id.* ¶ 4).  Team Leads and DSPs are assigned to specific residential sites, each of which houses one or more individuals receiving services. These staff members are responsible for the day-to-day supervision, care, and safety of the residents.  (*Id.* ¶ 5).  Team Leads and DSPs are supervised by AMP supervisors who oversee daily operations, manage staffing issues, ensure compliance, and respond to concerns for their assigned residential locations. Supervisors report to Krystie Stiles.  (*Id.* ¶ 6).  Supervisors rotate weekly as "on-call" supervisors to provide after-hours coverage for emergencies, shift coordination, and staff concerns. (*Id.* ¶ 7).

A.  Plaintiff's Employment

Plaintiff began his employment with AMP in December 2023 as a Team Lead.  (*Id.* ¶ 8). He was assigned to work the 8:00 a.m. to 4:00 p.m. shift, Monday through Friday.  (ECF No. 40 at 20 ¶ 10).  Rylee Ireland ("Ireland") served as Plaintiff's supervisor and oversaw AMP's Liberto location (the "Site") where Plaintiff was assigned.  (*Id.* ¶ 9).  Plaintiff disputes, however, that Ireland was his only supervisor, in that he was also supervised by Tarashae Butler ("Butler"). (ECF Nos. 38 & 40 ¶ 9; ECF No. 40 ¶ 10; ECF No. 40 at 19-20 ¶¶ 7-9).  In fact, Bernard Stiles

---

[3] 55 Pa. Code § 6100.182 provides that "[a]n individual may not be neglected, abused, exploited, or subject to corporal punishment." Similarly, 55 Pa. Code § 6400.32 mandates that "[a]n individual shall be treated with dignity and respect … [and] may not be abused, neglected, mistreated, exploited, abandoned, or subjected to corporal punishment."

("Bernie Stiles"), AMP's Training and Human Resources Manager ("HR"), also informed Plaintiff that Butler was one of his supervisors.  (ECF No. 40 at 20 ¶ 9).[4]

At the Site, Plaintiff was responsible for providing services to two adult residents with intellectual disabilities. One resident was nonverbal and diagnosed with profound autism and severe self-injurious behavior. The other had a moderate intellectual disability and a high risk of elopement.[5]  (ECF Nos. 38 & 40 ¶ 11).  At the outset of his employment, Plaintiff acknowledged the Human Services Expectation, which was part of AMP's DSP Employee Handbook and Operations Manual.  (*Id.* ¶ 12).  Plaintiff also signed the Team Lead Job Description, agreeing that staff would provide emergency coverage when needed.  (*Id.* ¶ 13).  Plaintiff was trained on the rights of individuals receiving services, on prevention of neglect, and on procedures related to emergency shift coverage.  (*Id.* ¶ 14). He received specific training that employees may be required to remain on-site past the end of their scheduled shift if no relief staff has arrived.  (*Id.* ¶ 15). Plaintiff also agreed that he would never leave an individual unattended, unless they have a fade[6] established, he has followed the proper protocol, and the individuals themselves have requested the fade, not the staff.  (*Id.* ¶ 16).  He understood his duty to remain with the residents until properly relieved by another staff member.  (*Id.* ¶ 17).  Finally, he acknowledged that his failure to follow the regulations and rights of the individual could result "in progressive corrective action up to and including immediate termination of employment."  (ECF No. 36-3 at 456).

B.  Plaintiff's Job Performance

---

[4] Krystie Stiles is married to and supervises Bernie Stiles.  Ireland is Krystie Stiles' daughter and Bernie Stiles' stepdaughter.  Ireland is supervised by her mother, Krystie Stiles.  (ECF No. 40 at 21 ¶¶ 18-19).
[5] In this context, elopement refers to leaving a health care facility without permission or authorization. https://www.merriam-webster.com/dictionary/elopement
[6] A "fade" is when a client has personal down time.  A fade is not in issue in this case.  (ECF Nos. 38 & 40 ¶ 16 n.3).

According to AMP management and other employees, Plaintiff was qualified for his job and performed it well.  (ECF No. 40 at 20 ¶ 11).  Other employees commented that he was professional, friendly, hardworking and always willing to help.  (*Id.* ¶ 12).  He worked many hours of overtime and often covered shifts when AMP was short-staffed.  (*Id.* ¶ 13).  In fact, AMP named him "Employee of the Month" for January 2024, for which he was awarded a $250.00 bonus.  (*Id.* ¶¶ 14-15).  Ireland's announcement of the award included the following description of Plaintiff as a:

> person [who] has gone above and beyond to learn as much as he can on not only his house, but AMP as a whole. He has caught many mistakes right out of the gate at his house and has already put in overtime for the guys he supports. This person has been very diligent with appointments and paperwork right out of orientation. This person is a pleasure to communicate and collaborate with . . . .

(*Id.* ¶ 16).  She further commended him on his "positive, solution-based attitude."  (*Id.*; s*ee also* Employee of the Month Notification, ECF No. 37-2 at 428-29).

### C.  Sexual Harassment

According to Krystie Stiles, AMP has a zero-tolerance policy for sexual harassment.  (ECF No. 40 at 21 ¶ 21; *see also* K. Stiles Dep., ECF No. 37-2 at 32).  If a supervisor receives a complaint of sexual harassment from an employee, the supervisor is required to report it to HR and the COO.  AMP is then required to investigate the complaint.  (ECF No. 40 at 21 ¶ 20; *see also* K. Stiles Dep., ECF No. 37-2 at 17-19).

Plaintiff testified that throughout his employment from early December 2023 until his termination near the end of February 2024, he was the victim of Butler's sexual harassment.  (ECF No. 40 at 22 ¶ 31).  On the first day he worked with Butler, she was speaking in "pretty sexual" terms in the car while riding to an appointment with a client.  (Boodoo Dep., ECF No. 36-3 at

214).  It was his first day and he didn't know "how to take it."  (*Id.*).  Thereafter, Butler began contacting Plaintiff "a lot."  (*Id.*).

Similarly, when Plaintiff was training another staff member, Butler arrived at the job location drunk and tried to "feel [him] up" while the other staff member was in a separate room. (*Id.*).  Butler also showed Boodoo her genital area during a FaceTime call.  (ECF No. 40 at 22 ¶ 23).  Plaintiff described an occurrence on FaceTime where he had given Butler some pomegranate juice, and a day or two later, while FaceTiming, she "poured, like—poured out some liquor and [was] like—opening her legs and, you know, being sexual and stuff."  (Boodoo Dep., ECF No. 36-3 at 214).

Plaintiff described another instance where Butler told him to go to her house in New Kensington while they both were with clients at separate locations.  She was drinking and made a pass at him.  Plaintiff told her that he was uncomfortable and that he was going to leave.  Butler responded saying: "you know, I can mandate you to stay here.  You're on the clock."  (*Id.* at 215). On another occasion, Butler told him "I want to fuck you."  (*Id.* at 292).

Butler's sexual comments and conduct were also witnessed by other employees, including Amanda English ("English"), Kyesha Blair ("Blair") and Monica Ford ("Ford").  (ECF No. 40 at 23 ¶ 34).  For example, Blair, who currently works for Defendant as a DSP, observed that Butler "constantly talked about sex" in the workplace, including making comments about the male employees with whom she had sex.  (*Id.* ¶ 35).  Butler also admitted to Blair that AMP created a fraternization policy because Butler "talked to too many boys."  (*Id.* ¶ 36).  Ford, who worked as a DSP, also observed Butler repeatedly talk about her sex life and with which employees she had had sexual relations. These conversations occurred while Butler was on duty. (*Id.* ¶ 37).  English, a former employee, also heard Butler talk about her sex life, including saying she wanted to sleep

6

with several employees, talking about male employees' "dicks," and making other sexual comments. Butler engaged in this conduct while she was a supervisor and admits that Plaintiff never said or did anything to make her feel uncomfortable or offended. (*Id.* ¶¶ 38-39).

In response to Butler's sexual advances, Plaintiff told her to stop but she failed to do so. (ECF No. 40 at 24 ¶ 40). From mid-January 2024 to mid-February 2024, Plaintiff made several complaints of sexual harassment to Defendant's management, including to Ireland and Bernie Stiles in HR. (*Id.* ¶ 41). In late January 2024, Boodoo complained to Ireland about Butler's behavior including telling her that Butler was saying "sexual things" and being "flirty." He also expressed concerns that Butler was acting aggressively. (*Id.* ¶ 42). In response, Ireland told Plaintiff that Butler "is like that and it's just who she is" but that they would "look into it" and "don't take it personal." (*Id.* ¶ 43). After his complaints to Ireland, Plaintiff also complained about Butler's behavior to Bernie Stiles. This conversation occurred in-person in Stiles' office. (*Id.* ¶ 44). Plaintiff specifically testified that he complained to Stiles that Butler was "sexually harassing him" and that she tried to "touch" him. (*Id.* ¶ 45). In response, Stiles became angry and "shrugged off" Plaintiff's complaints. (*Id.* ¶ 46). Butler continued to engage in the sexually inappropriate conduct toward Plaintiff. (*Id.* ¶ 47). Although Plaintiff does not recall the exact dates of these complaints, he confirmed that he did not make any complaints to Defendant during the first month of his employment (December 5, 2023, to January 5, 2024). Accordingly, his complaints of sexual harassment were made between January 6, 2024, and February 26, 2024. (ECF No. 40 at 25 ¶ 48). In fact, English testified that, Boodoo told her that Butler was sexually harassing him and that he complained to management but that they didn't do anything about it. (*Id.* ¶ 49). The parties agree that Plaintiff did not submit his complaints in writing. (ECF No. 38

& 40 ¶ 55).   Bernie Stiles and Ireland deny that Plaintiff complained to them about Butler's conduct.  (B. Stiles Dep., ECF No. 36-3 at 64; Ireland Dep., ECF No. 36-3 at 147-48).

Despite his complaints to Ireland and Bernie Stiles, nothing changed, and Butler's behavior continued.  (ECF No. 40 at 25 ¶ 50).  Ireland and Stiles said they would "talk to [Butler]" but they never did.  (*Id.* ¶ 51).  Butler was not disciplined.  (*Id.* ¶ 52; *see also* K. Stiles Dep., ECF No. 37-2 at 953).  AMP did not conduct an investigation into Plaintiff's complaints.  (ECF No. 40 ¶ 53).

D.  Religious Discrimination

Plaintiff identifies his religion as Santeria.  (ECF Nos. 38 & 40 ¶ 21).  In his religion, a full moon is significant because it is a time to communicate with spirits and provide certain offerings for blessings and release trauma from ancestors.  Plaintiff further explained that he practices his religious beliefs every day and that a full moon is not the sole source of religious significance: "[S]o the moon is not the owning source of my religion.  I have a [sic] altar.  I practice my religion every day on my own time personally.  There's other stuff as well.  The moon is not the only and sole factor of the religion."  (*Id.* ¶ 22).  Plaintiff explained that the full moon becomes particularly important when there are deaths or death anniversaries in the family.  (Boodoo Dep., ECF No. 36-3 at 233-34).

Prior to February 23, 2024, Plaintiff informed Butler about his religion.  (ECF No. 40 at 26 ¶ 60).  Butler commented on Plaintiff's religion, saying that he "shouldn't be messing around with that spiritual stuff" and that he "needs Jesus."  (*Id.* ¶ 61).  Butler would refer to Plaintiff as "Mr. Spiritual."  (*Id.* ¶ 62).  After hearing Butler's moniker, other employees began referring to Plaintiff as "Mr. Spiritual."  (*Id.* ¶ 63) (*See also* Amanda English Certification, ECF No. 37-2 at 443-46).

When a supervisor at AMP receives a request for a religious accommodation from an employee, the supervisor is required to report it to HR and the COO. (ECF No. 40 at 21 ¶ 20). A supervisor, however, has authority to grant a religious accommodation request. (*Id.* ¶ 22; *see also* K. Stiles Dep., ECF No. 37-2 at 939).

E. Events of February 23, 2024 to February 24, 2024

On February 23, 2024, Plaintiff was scheduled to work the 8:00 a.m. to 4:00 p.m. shift. (ECF No. 40 at 26 ¶ 64). Butler contacted Plaintiff and requested that he work the following shift, which was 4:00 p.m. to 12:00 a.m. (*Id.*). Plaintiff was not originally scheduled to work this shift. (*Id.*). Butler told Plaintiff that if he did not stay and work the 4:00 p.m. to 12:00 a.m. shift, she would no longer give him extra shifts. (ECF No. 40 at 27 ¶ 65). Plaintiff initially told Butler he could not do so because he had religious obligations that night. (*Id.* ¶ 66). After Butler kept asking him, he agreed to work the 4:00 p.m. to 12:00 a.m. shift because Defendant was short-staffed. (*Id.* ¶ 67). Plaintiff needed to leave by 12:00 a.m., however, because it was a full moon on February 24, 2024, and he needed to be home to engage in his religious practices, including prayers, offerings, and other religious rituals. (*Id.* ¶ 69).

Throughout the afternoon shift on February 23, 2024, Butler repeatedly reached out to Plaintiff and asked if he could stay and work the 12:00 a.m. to 10:00 a.m. shift, for which he was not scheduled. (*Id.* ¶¶ 70, 71). Butler then told Plaintiff that *she* was supposed to work the 12:00 a.m. to 10:00 a.m. shift but that she didn't want to work that shift because she "wanted to get drunk" that night. (*Id.* ¶ 72). During a phone call with Butler at approximately 5:00 p.m. on February 23, 2024, Plaintiff informed Butler that he could not work the overnight shift because of his religious beliefs. (*Id.* ¶ 73). Plaintiff also sent text messages to Butler indicating his inability to work the overnight shift because of his religious obligations. (*Id.* ¶ 75). Butler responded to

Plaintiff's text message stating that she was mandating him to stay. (Text Messages between Boodoo and Butler, ECF No. 36-3 at 474). Plaintiff replied that he was going to contact HR or Ireland. (ECF No. 40 at 28 ¶ 79).

Plaintiff then reached out to Ireland and explained that he had previously told Butler he could not work the overnight shift "due to religious practices," that his "religious practices conflict with work," and that he had already worked 24-hours straight, including agreeing to help out by working the 4:00 p.m. to 12:00 a.m. shift (at Butler's request), despite that he was not scheduled for the shift. (ECF No. 40 at 29 ¶ 81). Ireland responded that he should not be contacting her, that he was acting inappropriately and that, if he leaves, she will contact the police. (*Id.* ¶ 82). In addition to sending her text messages, Plaintiff also called Ireland several times, but Ireland did not answer or return his calls. (*Id.* ¶ 83). Butler then told Plaintiff that she was mandating that he stay for the 12:00 a.m. to 10:00 a.m. shift. (*Id.* ¶ 84). During these events, Butler was the on-call supervisor and responsible for ensuring coverage at each of the six houses she oversees. If she cannot find coverage, she is responsible for covering the shift. (*Id.* ¶ 85).

At 11:18 p.m., Plaintiff texted Butler to inform her that he would wait until 12:15 a.m. for coverage to arrive and would text her at that time if coverage did not arrive. (ECF Nos. 38 & 40 at ¶ 45). At 11:28 p.m., Butler texted Plaintiff that if he leaves his clients alone, AMP is required to call the police and he would be terminated. (*Id.* ¶ 46). Butler arranged for an individual to relieve Plaintiff and followed up with Plaintiff at 11:40 p.m. indicating that his relief was coming from New Kensington but would not arrive until 12:30 a.m. (*Id.* ¶ 47). At 12:15 p.m. Plaintiff texted Butler that coverage had not arrived. (*Id.* ¶ 48). Plaintiff left the Site at 12:15 a.m. His replacement arrived at 12:17 a.m. (*Id.* ¶¶ 49-50).

AMP issued a termination letter to Plaintiff dated Monday, February 26, 2024, citing neglect under state regulations because he left two intellectually disabled adult individuals alone. (*Id.* ¶ 51).

F.  Procedural History

On July 23, 2024, after Plaintiff received a right-to-sue letter from the EEOC, this lawsuit followed.  (ECF No. 1).  Defendant filed its Answer on October 2, 2024.  (ECF No. 12).  After completion of discovery and an unsuccessful ADR session (ECF No. 21), Defendant then moved for summary judgment.  (ECF No. 36).

III.  LEGAL STANDARD

Summary Judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ P. 56(a).  A genuine dispute of material fact is one that could affect the outcome of the litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal.  *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).  When considering the parties' arguments, the court is required to view all facts and draw all

inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

Finally, as discussed above, because Defendant failed to respond to Plaintiff's Counterstatement of Facts at ECF No. 40, the Court deems numerous material facts admitted pursuant to Local Civil Rule 56 E for the Western District of Pennsylvania.

## IV. DISCUSSION

AMP sets forth several arguments in support of its Motion for Summary Judgment. (ECF No. 36-4). First, it asserts that Plaintiff's claims under Title VII for religious discrimination, failure to accommodate and retaliation fail as a matter of law because undisputed evidence reveals that 1) AMP terminated Plaintiff's employment because he left his assigned overnight shift before relief arrived, leaving two, intellectually disabled adult residents unsupervised in direct violation of Pennsylvania law and AMP's internal policies; 2) AMP was unaware of any religious belief that conflicted with Plaintiff's job duties until shortly before the shift in question, and upon learning of his request, AMP made reasonable efforts to accommodate him; and 3) Plaintiff cannot establish that he engaged in protected activity for purposes of his retaliation claim, and even assuming that

he did, he cannot establish a causal connection between his text message request for a religious accommodation and his termination. (ECF No. 36-4 at 4-14).

Second, AMP contends that Plaintiff's allegations do not establish a hostile work environment in that they reflect only a few isolated interactions which at no point were physically threatening, humiliating or disruptive to his work duties, but just "shrugged it off." (*Id.* at 14-15). In addition, because Plaintiff never reported the alleged harassment, he engaged in no protected activity to support his retaliation claim. (*Id.* at 15-17). Nor can Plaintiff demonstrate causation because he was terminated for abandoning his residents. (*Id.* at 17).

The Court addresses each of these arguments below.

A. Plaintiff's Title VII/PHRA Claims for Religious Discrimination and Failure to Accommodate[7]

Title VII makes it an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a)(1). Pursuant to the statutory definitions, "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

1. Religious Discrimination

As to Plaintiff's claim that he was terminated because of his religion, the parties focus their arguments on the familiar *McDonnell Douglas* burden shifting paradigm, 411 U.S. 792 (1973).

---

[7] The Court of Appeals for the Third Circuit has "held that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002) (citing *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996)). Here, the parties do not contend that the PHRA should be interpreted any differently from federal law in this case.

(Defendant's Brief in Support of Summary Judgment, ECF No. 39 at 6-7, Plaintiff's Response, ECF No. 37 at 3-11).  Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802; *Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir. 2000) (citations omitted). To establish a *prima facie* case for discriminatory discharge, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for an employment position; (3) and he was discharged from that position; (4) under circumstances that give rise to an inference of unlawful discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 (3d Cir. 1996)). In addition, in a religious discrimination case, where one's religion will not always be apparent or documented, a plaintiff must also show that the employer knew of his religion.  *See Geraci v. Moody-Tottrup, Int'l,* 82 F.3d 578, 580-81 (3d Cir. 1996).

Here, Defendant concedes that Plaintiff satisfies his burden of establishing a *prima facie* case of religious discrimination.  (ECF No. 39 at 5 n.3).[8]

Accordingly, the Court will assume that Plaintiff has established a *prima facie* case with respect to the discrimination claim because the burden at the *prima facie* stage is "much less onerous than proving pretext with similar evidence." *Rhoden v. Children's Hosp. of Pittsburgh,* 2:14-0411, 2017 WL 4224655, at *4 (W.D. Pa. Sept. 22, 2017) (quoting *Opsatnik v. Norfolk S. Corp.*, Civil Action No. 06-81, 2008 WL 763745, at *4 (W.D. Pa. March 20, 2008), *aff'd* 335 F. App'x 220 (3d Cir. 2009) (citing *Simpson v. Kay Jewelers,* 142 F.3d 639, 646 (3d Cir. 1998)).  *See also Moussa v. Pa. Dep't of Pub. Welfare,* Civil Action No. 07-9, 2010 WL 1333333, at *8 (W.D.

---

[8] Despite Defendant's concession regarding Plaintiff's *prima facie* case, Plaintiff presents undisputed facts satisfying the first three elements of his *prima facie* case, as well as numerous issues of material fact that give rise to an inference of discrimination, including discriminatory comments; disparate treatment/comparator evidence; unusually suggestive timing; and evidence of replacement outside of the protected class.  *See* Plaintiff's Responsive Brief, ECF No. 37 at 3-7.

Pa. March 31, 2010) (analyzing the plaintiff's claims at the pretext stage where the defendant's *prima facie* and pretext-based arguments each relied on the same evidence).

Next, the burden of production shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason" for the unfavorable treatment. *McDonnell Douglas,* 411 U.S. at 802. In the instant case, Defendant's articulated reason for its termination decision is that Plaintiff left his assigned overnight shift before relief arrived, leaving two, intellectually disabled adult residents unsupervised, allegedly in direct violation of Pennsylvania law and AMP's policies. (ECF No. 39 at 5). The specific reasons for Plaintiff's termination were detailed in a letter from Bernie Stiles dated February 26, 2024, and provided in relevant part as follows:

> Per our phone discussion, . . . AMP is terminating your employment for neglect under the abuse category of the state, based on your job abandonment of 2-24-24. You abandoned your job shortly after 12 midnight without relief being there. This is a serious act of neglect for two individuals with dual diagnosis and profound autism, one of which does not communicate verbally or written. This is job abandonment, rights violation, [n]eglect of supervision which falls under the abuse category, as listed in the AMP operations manual and ODP regulations.
>
> Per your claim that what AMP did was against the law, we work under FSLA [sic] – Residential laws, health care guidelines. You cannot leave individuals unattended and if needed, police may need to be contacted for the safety of the two individuals who cannot be left unattended. The law, regulations and our policy are clear about this. Your attorney can contact our attorney at Ebony Law Firm, Keenan Holmes.

(ECF No. 37-2 at 474).

Once the employer comes forward with a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence "that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination." *Simpson v. Kay Jewelers,* 142 F.3d 639, 644 n.5 (3d Cir. 1998). A plaintiff must point to some evidence that might cause a factfinder

to either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale,* 200 F.3d at 105.  A plaintiff must do more than "simply show that the employer's decision is wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted).  He must provide evidence that could "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action."  *Id.* at 764 (emphasis in original) (citations omitted).

As to the first prong, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir. 2012) (quoting *Fuentes,* 32 F.3d at 765).  "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting *Carson v Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)).

Under prong two, "a plaintiff must provide evidence that allows the factfinder to infer that discrimination was the 'but-for' cause of the employer's decision."  *Surman v. UPMC Presbyterian Shadyside,* Civ. A. No. 17-184, 2018 WL 4901107, at *9 (W.D. Pa. Oct. 9, 2018) (quoting *Anderson v. Mack Trucks, Inc.,* 118 F. Supp. 3d 723, 741 (E.D. Pa. 2015) (citation omitted)).  Plaintiff may do so by showing "that the employer treated other, similarly situated persons not within his class more favorably, or that the employer discriminated against other

members of his protected class." *Moussa*, 2010 WL 1333333, at *9 (quoting *Fuentes*, 32 F.3d at 765). *See also Wright v. Providence Care Center, LLC*, 822 F. App'x 85, 92 (3d Cir. 2020) (citing *Simpson,* 142 F.3d at 645) ("[P]laintiff can demonstrate pretext by presenting evidence that similarly situated persons not within plaintiff's protected class were treated more favorably by defendant employer.")).

In the instant case, Plaintiff contends that Defendant's proffered reason for his termination—leaving his assigned overnight shift before relief arrived, leaving two, intellectually disabled adult residents unsupervised in direct violation of Pennsylvania law and AMP's policies—is pretext for unlawful discrimination. (ECF No. 37 at 8-11).

To establish pretext by comparison to other employees, Plaintiff must demonstrate that similarly situated employees outside of the protected class were treated more favorably or were accused of the same offense but disciplined in different ways. *Zahavi v. PNC Fin. Serv. Group, Inc.*, Civil Action No. 07-376, 2009 WL 904699, at *12 (W.D. Pa. Mar. 31, 2009) (citing *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004)). Employees are "similarly situated" when they "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Zahavi*, 2009 WL 904699, at *12 (quoting *Ogden v. Keystone Residence*, 226 F. Supp.2d 588, 603 (M.D. Pa. 2002)) (internal quotations omitted). Importantly, supervisors may be proper comparators for their subordinates where the record reveals that subordinates and supervisors were charged with many of the same duties and responsibilities. *See Sneed v. Swarthmore*, Civil Action No. 16-43, 2017 WL 3279231 at **1-2 (E.D. Pa. Aug. 2, 2017) (distinguishing *Monaco v. Am. Gen. Ass. Co.*, 359 F.3d 296 (3d Cir. 2004)). Accordingly, courts must engage in a "fact-intensive inquiry regarding the actual job duties and responsibilities of the plaintiff and the alleged comparators." *Id.* at *1.

Moreover, a plaintiff attempting to establish pretext based on inconsistent disciplinary actions must show that the comparator's misconduct "[was] of comparable seriousness to his own infraction" and that no "differentiating or mitigating circumstances" existed. *Tyler v. SEPTA*, Civ. A. 99-4825, 2002 WL 31965896, at *3 (E.D. Pa. Nov. 8, 2002), *aff'd,* 85 F. App'x 875 (3d Cir. 2003).

In meeting this burden, Plaintiff directs the Court to Butler, who although a supervisor, performed many of the same duties as Plaintiff and other Team Leads. (ECF No. 40 at 34 ¶ 114). Butler, who did not seek a religious accommodation or complain about sexual harassment, was treated more favorably than Boodoo, even though a factfinder could infer that she engaged in egregious abuse and neglect of residents. (*Id.*) Record evidence reflects that she came into work drunk, yelled and cursed at residents, called them "stupid" and "dirty," stole their money, and physically harmed them. (*Id.*) Butler was never disciplined or terminated by AMP. (*Id.* ¶ 116). Butler is supervised by Ireland, the same individual who supervised Boodoo; Butler was required to follow the same policies as Plaintiff, but she was never disciplined for her treatment of residents. (*Id.* at 35 ¶ 123). AMP was aware of Butler's abusive conduct because other employees made repeated complaints to Ireland, Bernie Stiles, and Krystie Stiles, who did nothing about her behavior. (*Id.* ¶ 122 n.21, ¶ 124 & n.22). They simply tolerated it and expected employees to tolerate it as well. *See* ECF No. 40 at 24 ¶ 43 ("[Butler] is like that and it's just who she is" . . . "don't take it personal.").

The Court also considers evidence submitted by AMP concerning other employees who were terminated for resident abuse/abandonment to demonstrate that AMP was enforcing a neutral policy when it terminated Plaintiff. (ECF No. 36-3 at 484-490). These termination letters, however, reveal AMP's draconian measures targeting Boodoo. It is undisputed that before February 24, 2024, at 12:15 a.m., Plaintiff had no disciplinary infractions and was regarded as an

outstanding employee. (ECF No. 40 at 20-21 ¶¶ 11-17). And from 12:15 a.m. until 12:17 a.m., Boodoo left two residents alone while they were sleeping before his replacement arrived at 12:17 a.m. It is also undisputed that these residents were not injured or harmed during this two-minute interval. (Ireland Dep., ECF No. 36-3 at 153; B. Stiles Dep., ECF No. 36-3 at 70). AMP's termination letters demonstrate that other employees were fired for far more egregious behavior than that committed by Boodoo, and some were given retraining or suspended before ultimately being terminated. For instance, the June 4, 2024 termination letter of Tyeisha McCray states that she "continued to arrive late for shifts and make errors with medication administration despite conversations with [her] supervisor and retraining . . . ." The letter also notes that she did not feed her residents, leaving them both to have cereal for all meals during her last weekend with them. (ECF No. 36-3 at 484). The June 10, 2024, termination letter of Alex Vining reveals that he left two residents alone for over seven (7) hours. (ECF No. 36-3 at 485). The April 28, 2023 termination letter to Gabe Idris indicates that he left a resident "alone on at least 5 occasion[s] between April 11 & April 20, 2023 for 30-45 minutes each time." (ECF No. 36-3 at 488). Idris was suspended before being terminated. (B. Stiles Dep., ECF No. 36-3 at 76). But Plaintiff, whose residents remained unharmed when left alone for two minutes, was not given a suspension nor the opportunity for retraining, nor any other progressive discipline as set out in AMP's policies and procedures. *See* ECF No. 36-3 at 456. Rather, Boodoo was immediately terminated for conduct far less egregious than other AMP employees. "Departures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role." *Mitchell v. City of Pittsburgh*, 995 F. Supp.2d 420, 434 (W.D. Pa. 2014) (Conti, J.) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). Additional evidence of AMP's departure from normal procedures was Butler's refusal to work the midnight to 10:00 a.m. shift on February

24, 2024, when she was unable to find coverage.  As the on-call supervisor, it was her responsibility to cover the shift.  *See* ECF No. 37-2 at 445, 450; ECF No. 40 at 29 ¶ 85).

Plaintiff also presents evidence of discriminatory remarks made by Butler regarding Boodoo's religion, and at times, mocking his religion.  Along with her overtly sexual comments, Butler commented that Plaintiff "shouldn't be messing around with that spiritual stuff" and that he "needs Jesus." (ECF No. 40 at 26 ¶ 61).  Even though Butler was not the ultimate decision maker with regard to Boodoo's termination, evidence reflects that she contacted Krystie Stiles about the events of February 23 through February 24, 2024 and forwarded Boodoo's text messages to Stiles that indicated his inability to work due to his religious practices.  (ECF No.40 at 31 ¶ 95).  Krystie Stiles communicated this information to Bernie Stiles.  (*Id.* ¶ 97).  Therefore, a jury could infer that Butler would have had input into the termination decision.  *See Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995) (holding that jury could reasonably infer that plaintiff's supervisor participated in decision to terminate him, even though others were final decision makers; evidence of supervisor's discriminatory animus would be relevant in determining if termination resulted from discriminatory motive.); *see also Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001) (collecting cases) ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate.").

The Court also considers the timing of Plaintiff's discharge--less than three days after he requested a religious accommodation, and within weeks of his final complaints of sexual harassment.  (ECF No. 40 at 32 ¶ 104; ECF No. 37-2 at 457).

Plaintiff presents the testimony/statements of former co-workers who testified as to Butler's discriminatory remarks, including English, Blair, Ford and Elizabeth Morton.  (ECF No. 40 at 23 ¶ 24).  These former co-workers further indicated that nothing was done to discipline

Butler for her mistreatment of residents and for her sexually inappropriate behavior. (ECF No. 37-2 at 444, 449). A reasonable fact finder could infer from this evidence that Defendant's reason for terminating Plaintiff was pretext for unlawful discrimination.

In sum, Plaintiff has come forward with sufficient evidence to raise an inference that his termination was the product of unlawful discrimination. Taking the record as a whole and construing all facts and inferences in favor of the Plaintiff, a reasonable factfinder could infer that Defendant's proffered reason for Plaintiff's termination was pretext for unlawful discrimination. *See Matsushita*, 475 U.S. at 587. Therefore, Defendant's Motion for Summary Judgment on the issue of religious discrimination under Title VII and the PHRA is denied.

2. Failure to Accommodate

In order to establish a failure to afford a religious accommodation under Title VII, an employee must show that (1) he held a sincere religious belief that conflicted with a job requirement; (2) he informed his employer about the conflict; and (3) he was disciplined for failing to comply with the conflicting requirement. *Smith v. City of Atlantic City,* 138 F.4th 759, 774 (3d Cir. 2025); *Fallon v. Mercy Catholic Medical Center of Se. Pa.*, 877 F.3d 487, 490 (3d Cir. 2017); *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000), *cited in, Mullen v. Astrazeneca Pharmaceuticals, LP,* Civil Action No. 23-3903, 2023 WL 8651411, at *3 (E.D. Pa. Dec. 14, 2023). It is the employee's responsibility to inform his employer of the conflict between the employer's policies, and the employee's religious beliefs. *Mullen*, 2023 WL 8651411, at *3 (citing *Geraci*, 82 F.3d at 581) (emphasizing the importance of this factor where the protected personal attributes of the employee are not obvious to the employer, such as cases involving religious discrimination and an attendant failure to accommodate)). To this end, the conflict, and not merely the request for an accommodation, must be conveyed to the employer so the employer

can determine what reasonable accommodation can be provided in accordance with its obligations under Title VII. *Id.* (citing *Miller v. Port Auth. of N.Y. & N.J.*, 351 F. Supp.3d 762, 778 (D. N.J. 2018) (finding that the object of a religious accommodation "is to 'eliminate [] the conflict between employment requirements and religious practices'" within the bounds of reasonableness.) (other citation omitted)).

The burden then shifts to the employer to show that it either made a good faith effort to accommodate the religious belief, or the accommodation would work an undue hardship upon the employer. *Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009) (citing *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000)).

Defendant advances several arguments as to why Plaintiff's claim fails as a matter of law. At the outset, AMP contends that the record demonstrates Plaintiff worked overnight during a full moon period the previous month without any objection or request for accommodation, establishing that his religious beliefs are not sincerely held. (Defendant's Brief in Support, ECF No. 39 at 8).

Plaintiff, however, presents evidence that a full moon is not his sole source of religious significance. He explained that the full moon becomes important when there are deaths or death anniversaries in the family. (Boodoo Dep., ECF No. 36-3 at 233-34).[9]

AMP further contends that Plaintiff failed to provide adequate or timely notice of his need for an accommodation, stating that it was not until shortly before 10:00 p.m. on February 23, 2024, that Plaintiff made a verbal reference to a religious issue while speaking to Butler. (ECF No. 39 at 9).

---

[9] For discussion of the origins and practices of the Santeria religion, see *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 524-25 (1993), *discussed in, Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 364-65 (3d Cir. 1999).

Rather, the record reflects that Butler was aware of his religion prior to February 23, 2024, and made denigrating remarks about it.  (ECF No. 40 at 26 ¶ 60, 61-63).  More importantly, during a phone call with Butler at approximately 5:00 p.m. on February 23, 2024, Plaintiff informed Butler that he could not work the overnight shift because of his religious practices.  (*Id.* at 27-28 ¶ 73).  Butler, therefore, had seven (7) hours to find alternate coverage for the 12:00 a.m. to 10:00 a.m. shift.  (ECF No. 40 at 28 ¶ 74).  In fact, as the scheduled on-call supervisor, Butler herself was required to work the shift if there was a staffing shortage.  (ECF No. 37-2 at 445, 450; ECF No. 40 at 29 ¶ 85).  Plaintiff also sent text messages to Butler concerning his inability to work the overnight shift because of his religious obligations.  (ECF No. 40 at 28 ¶ 75).  Importantly, because Plaintiff was not scheduled to work the 4:00 p.m. to 12:00 a.m. shift on February 23, 2024, or the 12:00 a.m. to 10:00 a.m. shift on February 24, 2024, there was no need for him to make a prior request for religious accommodation as he would have completed his shift at 4:00 p.m. on February 23, 2024.  Accordingly, he would have been home before midnight for his religious practices.  (*Id.* ¶ 77).

Finally, Defendant argues that even if Plaintiff requested an accommodation, AMP attempted in good faith to accommodate it.  (ECF No. 39 at 11-12).  Defendant continues that as soon as Butler knew of Plaintiff's concerns, she immediately began contacting staff to locate a replacement for the overnight shift, and secured coverage.

In response, Plaintiff presents evidence that in the event a supervisor was unable to establish coverage, it was the supervisor's responsibility to cover the shift.  (ECF No. 37-2 at 445, 450; ECF No. 40 at 29 ¶ 85).  Moreover, Plaintiff was not scheduled for that shift, had previously explained to Butler why he could not work that shift, and had already worked more than 24 hours

in a row.  (ECF No. 40 at 29 ¶ 84).  Yet, Butler mandated Boodoo to work because she wanted to get drunk.  (*Id.* at 30 ¶ 89).

In sum, Plaintiff has come forward with genuine issues of material fact that AMP could have accommodated Boodoo without undue hardship.  As supervisor, Butler was responsible for covering the overnight shift until Boodoo's replacement arrived at 12:17. The record reflects no reasons as to why Butler was unable to fulfill her responsibility.  Viewing the evidence in the light most favorable to the Plaintiff as it must on summary judgment, the Court finds that a reasonable fact finder could infer that Plaintiff held a sincere religious belief that conflicted with a shift that Butler pressured him to work; that he informed Butler seven hours before the commencement of the shift that it conflicted with his religious practices, and that he was terminated for failing to work the shift.  Accordingly, Defendant's Motion for Summary Judgment on the issue of failure to accommodate is denied.

B.  Plaintiff's Title VII/PHRA Claims of Sexual Harassment

Plaintiff complains that he was subjected to a sexually hostile work environment. (Amended Compl., ECF No. 26 at Count II).  Title VII makes it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e–2. "A plaintiff may further establish that an employer violated Title VII by proving that sexual harassment created a hostile work environment." *Huston v. Procter & Gamble Paper Prods. Corp.,* 568 F.3d 100, 104 (3d Cir. 2009) (citing *Kunin v. Sears Roebuck & Co.,* 175 F.3d 289, 293 (3d Cir. 1999)). Likewise, the PHRA provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . sex . . . of any individual . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such

24

individual, or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract." 43 P.S. § 955(a). "The Pennsylvania courts have held that hostile work environment claims are cognizable under the PHRA." *Hubbell v. World Kitchen, LLC,* 688 F.Supp.2d 401, 419 (W.D. Pa. 2010) (citing *Phila. Hous. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps.,* 956 A.2d 477, 484 (Pa. Commw. Ct. 2008); *Raya & Haig Hair Salon v. Pa. Human Rels. Comm'n,* 915 A.2d 728, 732–733 (Pa. Commw. Ct. 2007); *Infinity Broad. Corp. v. Pa. Human Rels. Comm'n,* 893 A.2d 151, 157–59 (Pa. Commw. Ct. 2006)).

"Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment." *Dreshman v. Henry Clay Villa*, 733 F. Supp.2d 597, 611 (W.D. Pa. 2010) (quoting *Weston v. Pennsylvania,* 251 F.3d 420, 425-26 (3d Cir. 2001) (other citation omitted). But "not all workplace conduct that has sexual overtones can be characterized as forbidden harassment." *Id.* (quoting *Weston,* 251 F.3d at 428). "In order to be actionable, the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment." *Id.* (quoting *Weston,* 251 F.3d at 428). Thus, to establish a violation of Title VII or the PHRA premised upon a hostile work environment, a plaintiff must establish that:

> 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability.

*Mandell v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." *Id.* (citing *Huston*, 568 F.3d at 104).

Defendant maintains that Plaintiff has failed to adduce sufficient evidence to establish his hostile work environment claim in that his interactions with Butler were infrequent, not physically threatening, humiliating or disruptive to his work duties. (ECF No. 39 at 15). And as to *respondeat superior* liability, AMP contends that it was not "sufficiently" made aware of any harassment. (*Id.* at 16).

Plaintiff responds with evidence as to all elements of a hostile work environment claim. First, as argued by Plaintiff, Butler made overt sexual comments and gestures to Boodoo such that her behavior was clearly based on sex. For instance, she stated to him that "I want to fuck you," rubbed up against him, groped him, talked about sex in the workplace, made passes at him, and displayed her genitalia to him. (ECF No. 40 at 22 ¶ 23). Therefore, viewing the record in the light most favorable to him, Plaintiff has presented sufficient evidence from which a reasonable jury could infer sex-based discrimination in accord with the first element.

Plaintiff also presents evidence that Butler's conduct was severe or pervasive. In evaluating this element, the Court must consider the totality of circumstances, rather than parse out each incident, and consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandell*, 706 F.3d at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *see also Carver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005) ("[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario."). Butler's inappropriate conduct spanned the

26

entire length of Plaintiff's employment with AMP.  It began on the first day he interacted with Butler and continued until he was terminated.  (ECF No. 40 at 22 ¶ 31).  Boodoo testified that Butler groped him, showed him her genital area during a FaceTime call, talked to him about sex and that she wanted to have sex with him, made a pass at him and when he objected, told him that she could mandate him to stay with her because he was "on the clock."  (*Id.* ¶¶ 23, 24, 26, 28).  Butler called Plaintiff continuously, even when he was not on duty.  (*Id.* ¶ 30).

Butler's behavior was also witnessed by other current and past employees who testified that Butler "constantly talked about sex" in the workplace and about male employees with whom she had sex.  (ECF No. 40 at 23 ¶¶ 35, 37, 38).  Butler also admitted to an employee that AMP created a fraternization policy because of her own inappropriate workplace behavior.  (*Id.* ¶ 36).  Moreover, despite his complaints to management, Butler's harassment continued.  (ECF No. 40 at 24 ¶¶ 40-47).  Again, viewing the record in the light most favorable to him, Plaintiff has come forward with sufficient evidence from which a reasonable fact finder could conclude that Butler's conduct was severe or pervasive such that the second element is satisfied.

As to the third element, Plaintiff presents evidence that he subjectively perceived the workplace to be hostile because in addition to asking Butler to stop, he complained to Bernie Stiles and Ireland.  (ECF No. 40 at 24 ¶¶ 40-45).  As such, a reasonable jury could conclude that Plaintiff subjectively perceived hostility in the workplace.

In determining whether the fourth element, the objective test, is met, the Court again looks to all the circumstances it considered in evaluating the second element: the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance.  *See Abramson*, 260 F.3d at 280 (quoting *Harris*, 510 U.S. at 23).  The Court finds that Boodoo has made a sufficient showing,

based upon the facts set forth at the second element, such that a jury could conclude a reasonable person would find Butler's conduct so offensive that it altered Plaintiff's working conditions.

Finally, as to the fifth element, the existence of *respondeat superior* liability, a jury could find that this prong has been met. Plaintiff complained to Bernie Stiles and Ireland that Butler was sexually harassing him. (ECF No. 40 at 24 ¶¶ 41-45). Yet, neither of them addressed the situation. (*Id.* ¶¶ 46-47). In fact, when Plaintiff complained to Ireland, she indicated that she had been aware of Butler's sexually inappropriate conduct in the workplace and explained that Butler "is like that and it's just who she is." (*Id.* ¶ 43). As noted above, the parties dispute whether Butler was Boodoo's supervisor. If the fact finder concludes that Butler was Boodoo's supervisor, AMP is strictly liable for Butler's actions because Butler's harassment culminated in Boodoo's termination. *See In re Tribune Media Co.*, 902 F.3d 384, 399 (3d Cir. 2018). If Butler is found to be merely a co-worker, then AMP is liable for her actions because it knew of the harassment and failed to take prompt and appropriate remedial action. *See id.* at 400. Therefore, the Court finds that Plaintiff has satisfied the fifth element such that a jury could find AMP liable for Butler's conduct pursuant to the doctrine of *respondeat superior*.

Accordingly, Plaintiff's claim for sexual harassment pursuant to Title VII and the PHRA must be decided by the fact finder. Defendant's Motion for Summary Judgment on this claim is denied.

C.    Plaintiff's Title VII/PHRA Retaliation Claims Pertaining to Religious Discrimination/Failure to Accommodate and Sexual Harassment.

AMP next argues that Plaintiff's retaliation claims fail as a matter of law because he did not engage in protected activity, and because it had legitimate business reasons to fire Boodoo. (ECF No. 39 at 12-14, 16-17).

To establish a *prima facie* claim of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) "a causal connection between the employee's protected activity and the employer's adverse action." *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022); *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002).  Making a request for a religious accommodation is a protected activity.  *Lindsay v. Chesney*, 179 F. App'x 867, 869 (3d Cir. 2006).  Likewise, informal complaints to management of discriminatory employment practices prohibited by Title VII are protected activities.  *Moore v. City of Phila.*, 461 F.3d 331, 343 (3d Cir. 2006); *Abramson,* 260 F.3d at 287-88 (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995)).  Concerning the second prong, termination is an adverse employment action.  *Abramson,* 260 F.3d at 288 ("We hold that Abramson's termination clearly fulfills the second prong of the prima facie case for a retaliation claim.").  As to causation, a plaintiff can generally establish a causal connection by showing that the temporal proximity between the protected activity and the adverse action is "unusually suggestive," or through a combination of timing and other evidence of ongoing antagonism or retaliatory animus.  *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280 (3d Cir. 2000).  If a plaintiff establishes a *prima facie* case of retaliation, the Court continues to the subsequent steps of the *McDonnell Douglas* framework outlined, *supra*, at IV.A.1.  *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (Burden-shifting framework applies to retaliation claims.).

Here, AMP terminated Boodoo just three (3) days after he requested a religious accommodation.  (ECF No. 40 at 32 ¶ 104).  The Third Circuit has held that "unduly suggestive timing" will raise an inference of a causal connection for purposes of a *prima facie* case of retaliation.  *See Fasold v. Justice,* 409 F.3d 178, 190 (3d Cir. 2005) (where time elapsed between

protected activity and adverse action is less than three months, there is a sufficient evidentiary basis from which an inference of retaliation can be drawn); *Javil v. Avdel Corp.*, 873 F.2d 701 (3d Cir. 1989) (two days is unusually suggestive); *see also Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017) ("An inference of 'unduly suggestive' temporal proximity begins to dissipate where there is a gap of three months or more between the protected activity and the adverse action."). Accordingly, a reasonable fact finder could infer from this evidence that Plaintiff has satisfied his *prima facie* case of retaliation for purposes of his religious discrimination claim. Similarly, AMP terminated Boodoo just weeks after his final complaint of sexual harassment to management. (ECF No. 37-2 at 457) ("Plaintiff had complained about the sexual harassment from mid-January to mid-February of 2024."). Again, Plaintiff has raised an issue of material fact such that a reasonable jury could conclude he has satisfied his *prima facie* case of retaliation for purposes of his sexual harassment claim.

Given these rulings, Plaintiff has met his burden of production and the burden shifts to AMP to articulate a legitimate, non-retaliatory reason for its employment action. Defendant's burden here is "relatively light." *Fuentes*, 32 F.3d at 763. "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a [non-retaliatory] reason for the unfavorable employment decision." *Id.* AMP has met its burden because it has presented evidence that Plaintiff was terminated because he left two, intellectually disabled residents unsupervised during an overnight shift, allegedly in violation of Pennsylvania regulations and AMP's internal policies. (ECF No. 36-3 at 483).

In order to overcome AMP's proffered legitimate non-retaliatory reason for its action, the burden shifts to Boodoo to prove by preponderance of the evidence that such action was pretext for religious and sex discrimination.

In this Court's estimation, Plaintiff has met his burden to present evidence of pretext and disputed factual issues remain which would otherwise preclude summary judgment. As discussed, *supra*, at IV.A.1., relating to his claims of discrimination, Plaintiff has come forward with comparator evidence; evidence concerning AMP's failure to follow company policies/protocols; evidence of discriminatory comments and antagonism; corroborating witness statements; and evidence of AMP's utter failure to investigate Plaintiff's complaints of harassment. Certainly, these facts, when viewed in the light most favorable to Boodoo, are reasons for the factfinder to disbelieve AMP's proffered reasons for termination.

As such, Defendant's Motion for Summary Judgment concerning Plaintiff's Title VII and PHRA claims for retaliation is denied.

## V.  CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment (ECF No. 36) is denied as to Counts I, II, and IV of the Amended Complaint (ECF No. 26).[10]

An appropriate Order will follow.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated: October 7, 2025

cc/ecf: All counsel of record

---

[10] Count III, alleging a violation of the Adult Protective Services Act, is dismissed.